# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLETTA VICKI RYAN, as Heir and Representative of the Estate of Aaron Ryan, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ASTRUE, Commissioner of Social Security, <br><br> Defendant. | 1:08cv01609 DLB <br><br> ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |

## **BACKGROUND**

Colletta Vicki Ryan, as Heir and Representative of the Estate of Aaron Ryan ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On December 8, 2008, the action was reassigned to the Honorable Dennis L. Beck for all purposes.

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his initial applications in November 2002, alleging disability since July 27, 2002, due to his AIDS diagnosis. AR 142-144, 170-179, 395-397. The Commissioner denied Plaintiff's applications at the hearing level and the Appeals Council ultimately remanded the claim on May February 11, 2005. AR 75-84, 114-117.

After remand, Plaintiff failed to appear at the hearing and his action was dismissed by Administrative Law Judge ("ALJ") Bert C. Hoffman, Jr. AR 88-90. The Appeals Council again remanded the claim. AR 93-95.

On December 12, 2006, ALJ Hoffman held a hearing pursuant to the order of remand. AR 444-472. He issued a decision denying benefits on April 26, 2007. AR 36-47. The Appeals Council denied review on May 14, 2008. AR 19-21.

Plaintiff passed away on July 15, 2008. Opening Brief, at 4.

<u>Hearing Testimony</u>

ALJ Hoffman held a hearing on December 12, 2006, in Fresno, California. Plaintiff choose to appear without representation. Robin Ryan, Plaintiff's sister, also appeared and testified. AR 444.

Ms. Ryan testified first, explaining that Plaintiff has lived with her for the past six months, and she sees his health declining and how tired he gets from doing things. AR 447. For example, if Plaintiff does get the energy to mow or clean up, he's "down for three days afterwards." Plaintiff also loses his appetite and is "sick to his stomach in both directions." AR 448. She explained that his energy comes and goes. AR 449. When he's not feeling well, he gets up for the morning and goes back to bed shortly thereafter. AR 451. There have been times when he's stayed in his room for a week, only leaving to go to the restroom and maybe smoke a cigarette. AR 458. Ms. Ryan believed that many of his medications make him sick to his stomach and cause diarrhea. AR 458. She was also aware of his weight fluctuations. AR 458.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff enjoys cooking full meals. AR 456. He occasionally goes out of the house on his bicycle to get his own cigarettes and soda, and he sometimes helps his mom "do some stuff." AR 452. Ms. Ryan sometimes takes Plaintiff to the movies or to the grocery store. AR 452. He talks to his friends on his trips to the corner store. She testified that Plaintiff was not drinking or doing drugs. AR 454-455.

Plaintiff previously worked at the Dole processing plant, putting lids on cans. He would work and then come home and sleep until it was time to go to work again. AR 452. He also worked holding signs on corners until a few weeks ago, when he was laid off because of weather. AR 453. Plaintiff worked at that position for four hours on Saturday and four hours on Sunday. AR 453.

Plaintiff testified that he thought he weighed about 160 pounds, and that he usually averaged between 145-160 pounds. He took a medication to help him gain weight, which helped him get to a certain weight. He is currently on his second set of drugs, and has been on this mix for about two years. Plaintiff has received his treatment at the Merced Clinic for the past four years because he does not have insurance, and goes once every three to six months. AR 460, 471.

When asked by the ALJ, Plaintiff explained that his "four cell count" was going up and down but then stabilized. Plaintiff testified that his count has a lot to do with stress. When he exerts himself, his counts go up and down. If he doesn't do anything and just maintains, his counts are okay. AR 461.

Plaintiff stated that he is still listed with a temp agency and has inquired about positions. Since most of the jobs are seasonal and he cannot do anything for a long period of time, he has not had a job. He explained that he could do the sign holding job because it was only four hours each on Saturdays and Sundays and it wasn't too difficult to hold a sign on the corner. As for his production jobs, he would work for a week and then he would sleep for a week because of the toll it took on his body. He would also work two or three days, and then miss two or three days. AR 462.

Plaintiff explained that his health fluctuates, meaning that he usually doesn't feel well for two or three weeks and then feels like he can do something. Once he does something, though, he usually overdoes it and is not able to do anything again for another two or three weeks. AR 464. He also explained that he often does not have an appetite. AR 466. For example, when he worked full days, he would eat a sandwich during the day and then come home and go to sleep. AR 466. He has diarrhea "all the time" and is in the restroom four or five times a day. Although he takes medicine to counteract the diarrhea, it doesn't work. AR 467. Plaintiff also has chronic thrush that does not go away. AR 468.

Plaintiff testified that he is faithful in taking his medications, though he stopped for a period before they changed his medication mixture. AR 468.

Plaintiff stated that it has been about a year and a half since he did drugs and about two or three months since he drank alcohol. AR 462. He does not have a driver's license because he lost it after a DUI 12 years ago. AR 463.

When asked to describe his day, Plaintiff testified that when he's working, his days mostly consist of getting up, going to work, and coming home. AR 468. The rest of his time is spent watching television and resting. If he's well enough to do yard work, he will. AR 469. He doesn't do "a bunch of little things" because it "just doesn't work that way anymore." AR 469. He went on a five day trip with his mother about a month ago, and it was fine because he really didn't have to do anything. AR 469.

The ALJ gave Plaintiff the definition of sedentary work and asked if he thought he could do that type of job. Plaintiff testified that he would probably be all right for a while, but didn't know if he could do it five days a week, everyday, for 52 weeks a year. AR 470.

At the end of the hearing, Plaintiff's sister clarified that Plaintiff is able to do things, such as taking out the trash, doing his laundry and taking care of his personal needs. However, after he does it, he is very tired for days afterwards. AR 471.

<ins>Medical Record</ins>

On October 18, 2002, Jennifer Ross, M.D., wrote a letter indicating that Plaintiff was under her care and had "disabling AIDS." AR 267.

Plaintiff was treated by Katharina Truelove, M.D., at Mercy Medical Center, on November 22, 2002. He complained of back pain and left arm pain. He also indicated that he had thrush about eight months ago, and that his anxiety medication was not working. Plaintiff's Paxil was increased. AR 302.

On December 13, 2002, Plaintiff complained of numbness in his left arm. Dr. Truelove discussed his treatment options and Plaintiff decided that he did not want to take any extra medications, as he felt "pretty good" right now. Plaintiff reported that Paxil was not helping much. He was also taking Vicodin for chronic pain. AR 301.

On January 31, 2003, Plaintiff returned to Dr. Truelove for complaints of big toe pain. He was instructed to take ibuprofen for pain and to soak his feet. He was 6'1" tall and weighed 142 pounds. Dr. Truelove instructed Plaintiff to take Ensure. AR 300.

Plaintiff saw Dr. Truelove on February 14, 2003, for follow-up on his toenails. He did not get Ensure, but his weight was up to 149. He was doing well on his medications. AR 295.

On March 8, 2003, Plaintiff saw Usman Ali, M.D., for a consultive internal medicine examination. Plaintiff indicated that he was diagnosed with HIV in 1999 and that he is tired and fatigued all day. Plaintiff also reported that he has lost 10-15 pounds in the past few months, has constant diarrhea, and takes medication for HIV and oral thrush. Plaintiff was doing "cleaning work" at Burger King, but after four hours, he felt very tired and fatigued. AR 270.

On examination, Plaintiff was a thin, white male. His anterior cervical lymph nodes were enlarged, but nontender. Range of motion, strength, motor and sensory testing were all normal. Dr. Ali diagnosed Plaintiff with HIV, and noted that according to Plaintiff, his CD4 counts are very low, and he feels tired and fatigued all the time. Based on his symptomatology alone, Plaintiff may be able to lift and carry about 20 pounds, stand and walk for about six hours, with breaks every two hours, and sit for six to eight hours, with breaks every two hours. He may have difficulty with climbing, but had no other restrictions. AR 271-273.

On March 20, 2003, State Agency physician Herbert Mitchell, M.D., completed a Physical Residual Functional Capacity Assessment. He opined that Plaintiff could occasionally

1  lift and carry 50 pounds, 25 pounds frequently, stand and/or walk for six hours and sit for about
2  six hours.  AR 324-331.
3       On April 26, 2003, Steven C. Swanson, Ph.D., performed a consultive psychological
4  assessment.  Plaintiff reported that he felt good the day of the interview and that he felt good
5  emotionally most days.  Plaintiff's mental status examination was essentially normal and Dr.
6  Swanson diagnosed amphetamine abuse, in remission, and alcohol abuse, in remission.  Plaintiff
7  could maintain concentration, understand, remember and carry out simple instructions, relate
8  appropriately to others, adapt to usual work situations and deal with changes in routine.  AR 274-
9  278.
10      On April 30, 2003, State Agency physician Ida Hillard, M.D., opined that Plaintiff did not
11  have a severe mental impairment.  AR 334.
12      On May 22, 2003, Plaintiff was seen at Mercy Medical Center and complained of pain in
13  his left arm.  He also indicated that he has tried two jobs but that full-time work leaves him
14  exhausted.  He thought he could work for six hours, but believed that five eight-hour days would
15  be too much.  He was diagnosed with fatigue secondary to AIDS.  He was stable on his
16  medications.  AR 280.
17      On June 30, 2003, Plaintiff saw R. Roussos at Mercy Medical Center and indicated that
18  he wanted to try another anxiety medication.  AR 340.
19      On July 9, 2003, State Agency physician George A. Jansen, Sr., M.D., completed a
20  Physical Residual Functional Capacity Assessment.  He opined that Plaintiff could occasionally
21  lift and carry 20 pounds, 10 pounds frequently, stand and/or walk for six hours, with breaks every
22  two hours, and sit for about six hours.  Dr. Jansen noted that Plaintiff's allegation of HIV and
23  fatigue is credible, but the severity was not supported by the objective evidence.  Plaintiff had
24  "adequate daily activities" and told his treating physician that he could work for six hours a day,
25  but not eight.  AR 313-320.
26      X-rays taken in August 2003 of Plaintiff's thoracic spine were normal.  X-rays of his
27  chest showed probable hyperinflation of the lungs, but no evidence of acute chest disease.  AR
28  338.

1    Plaintiff saw Dr. Roussos on September 8, 2003, and reported no physical issues and no
2 issues with anxiety.  AR 337.
3    On October 24, 2003, Plaintiff saw Dr. Roussos for follow-up care.  His weight was 166
4 pounds.  AR 336.
5    Plaintiff saw Dr. Roussos on January 13, 2004, again for follow-up.  His temperature was
6 97.7 and his physical examination was normal.  AR 370.
7    On March 24, 2004, Plaintiff's temperature was 97 degrees and he weighed 151 pounds.
8 Plaintiff reported that he was hit by a truck last month.  His physical examination was normal.
9 Dr. Roussos refilled Plaintiff's medications and ordered additional blood tests.  AR 369.
10   Plaintiff returned to Dr. Moriarty on August 24, 2004, complaining of neck, back and
11 chronic left arm pain.  He reported that he was taking Vicodin for the pain, and that it was
12 helping.  Plaintiff also expressed concern that he had been on the same medications since 2002,
13 though he felt "very well" and had no opportunistic infections.  He also reported that he tolerated
14 the medications well.  Plaintiff's temperature was 97.2 degrees and he weighed 144 pounds.  Dr.
15 Moriarty refilled his medications, discussed health maintenance with Plaintiff and ordered blood
16 tests.  AR 367.
17   On September 10, 2004, Dr. Moriarty noted that Plaintiff's CD4 count was very low and
18 he had an elevated viral load.  Plaintiff had no infections and Dr. Moriarty altered his
19 medications.  AR 366.
20   Plaintiff saw Dr. Moriarty on October 8, 2004, complaining of upper respiratory infection
21 symptoms.  He also reported fatigue and malaise, as well as chronic diarrhea.  AR 365.  Plaintiff
22 weighed 149 pounds.  Dr. Moriarty discussed the importance of adhering to his new medications
23 and instructed him to take Immodium for his diarrhea.  AR 365.
24   On October 8, 2004, Dr. Moriarty completed a an AIDS Medical Verification form.  She
25 indicated that Plaintiff's symptoms included HIV wasting syndrome caused by chronic diarrhea,
26 chronic weakness and documented fever.  AR 352.

On December 7, 2004, Plaintiff returned for his lab results. He weighed 161 pounds. His CD4 count had increased but his viral load was down. He was instructed to continue his current medications. AR 363.

On April 5, 2005, Plaintiff saw Dr. Moriarty and complained of chronic left arm and back pain, as well as left foot numbness after performing extensive yard work. He stated he felt well and had no recent infections. Plaintiff weighed 157 pounds. His CD4 was increased, as was his viral load, though the increase was not statistically significant. Dr. Moriarty refilled Plaintiff's medications. AR 362.

In a note dated May 12, 2005, Dr. Ross indicated that she had not seen Plaintiff since April 23, 2002. AR 394.

On June 20, 2005, Plaintiff presented to the emergency room complaining of a painful, burning rash on the right side of his neck. Plaintiff was diagnosed with shingles and given Vicodin for pain.

As instructed by the emergency room, Plaintiff followed-up with Dr. Moriarty on July 21, 2005, and complained of pain in his neck. He weighed 146 pounds and his temperature was 97.6 degrees. He had healed and crusted lesions over his right scalp and ear. Plaintiff was also hypersensitive over the right side of his face and right upper chest and neck. He was diagnosed with shingles and post-herpetic neuralgia and was given antiviral medications. AR 390.

On July 21, 2005, Plaintiff went to the emergency room for a cut on his forehead after a car he was riding in stopped short and he hit his head on the dashboard. His wound was cleaned and dressed. AR 388.

Plaintiff saw Dr. Moriarty on August 11, 2005, for moderate left arm and back pain. He weighed 152 pounds and his temperature was 95 degrees. His CD4 count was decreased and his viral load was increased. Dr. Moriarty discussed the worsening labs with Plaintiff and he was "adamant" that he was adherent to his medications. He had good weight gain and no complaints. AR 387. Dr. Moriarty described his AIDS as "poorly controlled" and noted that she discussed with Plaintiff the "extreme importance" of close adherence to his medications. AR 387.

Plaintiff returned to Dr. Moriarty on August 18, 2005.  His temperature was 97.3 and he weighed 155 pounds.  Plaintiff complained of crying, isolating himself and not following his medication regime.  On examination, he was tearful at times and withdrawn.  Plaintiff was prescribed Effexor for his depression and was referred to behavioral health.  AR 386.

Plaintiff saw to Dr. Moriarty on January 24, 2006.  His weight was 167, which was described as "great weight gain."  Plaintiff reported that since he began Effexor, he felt much better overall.  Plaintiff's appearance was described as "great," and he had good color and was less gaunt.  Plaintiff's shingles were gone and he was taking his medications as instructed.  AR 385.

Plaintiff was seen in the emergency room on April 4, 2006, for oral thrush that was getting progressively worse.  He reported that he ran out of Diflucan a few weeks ago and then began having symptoms of thrush.  Plaintiff reported difficulty swallowing secondary to pain.  He was diagnosed with esophageal candidiasis, acute exacerbation, and ordered to restart his Diflucan and advised to rinse with nystatin.  AR 383-384.

Plaintiff was seen on May 3, 2006, and complained of sharp pain in his arms.  His temperature was 97.4 degrees and he weighed 156 pounds.   Plaintiff reported that he had run out of some medications and needed refills.  He appeared stable and his medications were refilled.  AR 382.

On June 5, 2006, Plaintiff was seen at the emergency room for complaints of right ankle pain after he slipped down the stairs and twisted his ankle.  His x-ray was negative and he was diagnosed with a right ankle strain.  Plaintiff was given crutches and pain medication and excused from his job as a truck driver for three days.  AR 379-380.

In September 2006, Plaintiff was treated at the emergency room after he flipped over the handlebars of his bike.  AR 374.

A notation in the record indicates that Plaintiff refused to cooperate with a consultive examiner in April 2007 and therefore an examination was not performed.  AR 252.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairment of an HIV infection. His HIV infection did not, however, meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. After considering the medical evidence and Plaintiff's testimony, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, to stand and/or walk for six hours and to sit for six hours. With this RFC, the ALJ determined that Plaintiff could perform his past relevant work as a cashier. Even if he could not perform the cashier position, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy pursuant to Medical Vocational Guideline 202.17. AR 38-47.

## **SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (HIV infection) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) can perform his past relevant work as a cashier; and alternatively, (5) retains the RFC to perform a significant number of light jobs. AR 38-47.

Here, Plaintiff argues that the ALJ erred in rejecting his testimony.

**DISCUSSION**

Plaintiff contends that the ALJ improperly assessed his subjective symptoms testimony.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

---

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan,* 169 F.3d at 599 (quoting *Lester,* 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair,* 885 F.2d at 603; *see also Thomas,* 278 F.3d at 958-59.

The gist of Plaintiff's testimony was that he was able to perform activities, such as taking out the trash, doing his laundry, taking care of his personal needs, and even working, though after he becomes extremely tired and fatigued. He also testified that his health fluctuates, as he can feel sick for a few weeks and then fell well enough to do something. When he does something, though, he becomes extremely fatigued and the cycle begins anew. Plaintiff also testified that he has diarrhea all the time and is in the restroom four or five times a day.

As a threshold matter, Mrs. Ryan suggests that Plaintiff's death in July 2008 demonstrates the severity of his symptoms. Opening Brief, at 8. While Plaintiff's death is certainly unfortunate, that he died 14 months after the ALJ's decision does not necessarily demonstrate disability during the relevant time period, July 22, 2002, through April 26, 2007. In Mrs. Ryan's letter to the Appeals Council shortly before Plaintiff passed away, she indicates that he had been progressively worsening over the past year. She also indicates that he began suffering symptoms that were not present during the relevant time period, such as difficulty walking, chronic cough, muscle weakness and seizure activity. His death therefore is not indicative of his health during the time period at issue. *See eg. Sanchez v. Sec'y of Health and Human Servs.,* 812 F.2d 509,

12

512 (9th Cir. 1987) (new evidence demonstrated, at most, deterioration after the hearing, which would be relative to a new application but not probative of claimant's condition at the hearing.)

In assessing Plaintiff's credibility, the ALJ began by stating that the "subjective statements in this case are not credible or persuasive." AR 45. As to Plaintiff's statements about his diarrhea, the ALJ correctly noted that the statement by Plaintiff's mother in the Third Party Function Report did not mention diarrhea[4] and the most recent notation in the treatment records referencing diarrhea was in October 2004. AR 45, 212-220.

As to the treatment records, Plaintiff first complained of chronic diarrhea during his consultive examination with Dr. Ali in March 2003.[5] AR 270. He complained again of chronic diarrhea in October 2004, and was treated with Immodium. AR 365. Plaintiff did not make any further complaints of diarrhea, nor was there any indication that he continued to take Immodium. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (claimant not credible where her statements were inconsistent with treatment records).

Insofar as Plaintiff contends that any reference to the objective medical evidence in analyzing disability is improper under *Bunnell v. Sulllivan*, 947 F.2d 341 (9th Cir. 1991), he is incorrect. *Bunnell*, in recognition of the regulations, prohibits discrediting a claimant's testimony *solely* on the basis of lack of objective medical evidence. Here, the ALJ examined other aspects of Plaintiff's history in analyzing his credibility.

The ALJ next moved on to Plaintiff's daily activities, characterizing the record as showing an "active lifestyle." AR 45. In support of his finding, the ALJ cites Plaintiff's five day trip to Seattle, yet he fails to acknowledge Plaintiff's testimony that he "didn't have to do much except for just checking everything out," and that his mother did all the driving. AR 45, 469. The ALJ also points to Plaintiff's ability to work "holding a sign on a street corner for hour hours

---

[4] Although the Third Party Function Report did not specifically ask for Plaintiff's symptoms and instead focused on Plaintiff's functionality, the ALJ is responsible for interpreting the evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

[5] Defendant's statement that the "only reference to diarrhea in the treatment records, which span almost 4 years, was in October 2004," is incorrect. Opposition, at 9 (emphasis in original).

1  a day on weekends," yet again fails to acknowledge Plaintiff's testimony that the only reason he
2  could perform this position was because it was only four hours each on Saturdays and Sundays
3  and it wasn't too difficult to hold a sign on the corner. AR 462.
4        The ALJ also cites Plaintiff's ability to ride a bicycle, use a computer, go to the post
5  office, clean his room, play with his pets, do some yard work, cook, do laundry, and shop for
6  groceries and clothing. AR 45. These activities, however, do not contradict Plaintiff's testimony
7  that he *can* perform some activities but then becomes extremely fatigued afterwards. The ALJ's
8  analysis suggests that Plaintiff alleged he could not do *anything*, when in fact Plaintiff testified
9  that he was capable of many tasks, but the performance of these tasks renders him essentially
10 bedridden. It is this exhaustion that Plaintiff points to, not a physical impairment such as a back
11 or leg injury, in support of his disability, and the ALJ's citation to activities that Plaintiff admits
12 he can do in no way undermines his testimony.
13       Similarly, the ALJ points to a notation in the medical record that Plaintiff was a truck
14 driver in 2006, but again, Plaintiff admitted he was able to perform *some* work. AR 45. *Orn v.*
15 *Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) ("This court has repeatedly asserted that the mere fact
16 that a plaintiff has carried on certain daily activities ... does not in any way detract from her
17 credibility as to her overall disability.") (internal citations omitted); *see also Fair v. Bowen,* 885
18 F.2d 597, 603 (9th Cir. 1989) (daily activities "may be grounds for an adverse credibility finding
19 'if a claimant is able to spend a ***substantial*** part of his day engaged in pursuits involving the
20 performance of physical functions that are transferable to a work setting,'") (emphasis added).
21       The ALJ next makes a somewhat oblique statement, asserting that the "records also
22 indicate that the claimant has a male 'partner'... but he was not mentioned during the testimony at
23 the hearing." AR 45. As this statement is sandwiched between Plaintiff's daily activities, it
24 seems to imply that the fact that Plaintiff has a partner somehow demonstrates that he is not as
25 impaired as he alleged. Surely, the ALJ cannot mean to suggest that the presence of a significant
26 other in a claimant's life renders a claimant able to do more than the claimant states.
27       The only alternate meaning is that because Plaintiff did not "mention" his partner during
28 the hearing, he was somehow less than honest, rendering his overall credibility questionable. Not

only is it unreasonable to discredit Plaintiff for not disclosing his personal life when it was not relevant, the ALJ's suggestion that Plaintiff was hiding something is disingenuous. During the hearing, the following colloquy took place:

> ALJ: Do you still have a friend?
>
> Plaintiff: Do I have a friend? No. What do you mean friend, a partner?
>
> ALJ: Yeah.
>
> Plaintiff: No, he passed away.
>
> ALJ: Seems to me I saw something in here. And when did that occur, sir?
>
> Plaintiff: 2003. Towards the end of the year. 2003.

AR 464.

From this discussion, it is apparent that the ALJ is unfairly characterizing Plaintiff as dishonest. First, since Plaintiff and the ALJ met at a prior hearing in 2004, the ALJ's use of the term "still" seems to imply something of a continuing nature. Plaintiff obviously answered based on his long term relationship with his partner who passed away. The ALJ states that he saw something to the contrary in the records, but does not ask for clarification and instead validates Plaintiff's understanding by asking when his partner passed away. While there are notations in the record of a significant other referred to as Diego in August 2005 and January 2006, as well as an assault by an unnamed significant other in July 2006, it doesn't necessarily mean that they were still together at the time of the December 2006 hearing. AR 375, 385, 387. In any event, for the ALJ to determine that Plaintiff was dishonest where it is not clear that Plaintiff affirmatively withheld information, or where the ALJ did not clarify his question, is not clear and convincing evidence.

The ALJ moves on to discuss Plaintiff's positive response to medication, the absence of infections and Plaintiff's reports that he was doing well. AR 45. Plaintiff does not address the ALJ's reliance on these factors, but the Court must nonetheless review the factors to determine whether the ALJ's determination is supported by substantial evidence. As the ALJ found, the medical records demonstrate that Plaintiff generally responded to treatment, though his blood counts and weight did seem to fluctuate more than the ALJ acknowledges. Plaintiff also reported

that he felt good on numerous occasions, most recently in January 2006 when he had great weight gain and indicated that he felt "much better overall." AR 295, 301, 362, 367, 385. The medical record also shows instances of thrush and shingles, but Plaintiff's shingles had healed as of January 2006 and there were no further complaints of thrush after April 2006. In fact, the ALJ correctly notes that Plaintiff's most recent treatment in June and September 2006 was unrelated to his HIV infection. AR 374, 379-380. *See eg., Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (ALJ is permitted to consider lack of medical treatment in assessing credibility); *Morgan v. Comm. of Social Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999) (ALJ's finding that symptoms improved with medication was valid consideration in assessing claimant's credibility).

Next, the ALJ references the instances of Plaintiff's non-compliance in the record, which Plaintiff does not dispute. AR 46. For example, when Plaintiff sought treatment for oral thrush in April 2006, he reported that he had run out of Diflucan, an anti-fungal medication, "a few weeks ago" and since then, his symptoms appeared. AR 383. He also ran out of some medications in May 2006. AR 382. In August 2005, Plaintiff admitted that he was not following his medication regime. AR 386. Plaintiff's compliance is a proper consideration in analyzing his credibility. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (claimant's failure to seek or follow prescribed treatment is a proper basis for finding her allegations of disabling pain and other symptoms not credible).

Finally, the ALJ cites Plaintiff's behavior at his April 2007 consultive examination. An April 3, 2007, notation in the record states, "MDSI called and stated clmt refused to cooperate with the doctor, they stated he kept making comments to the MA, stated he was very difficult so no exam was done." AR 252. As Defendant points out, an ALJ may find the claimant disabled if he refuses to take part in a consultive examination without good reason. 20 C.F.R. 404.1518(a). Although the notation in the record is short and does not indicate why Plaintiff refused the examination, he did not provide the Court with *any* explanation. The ALJ may also use "ordinary techniques" in addressing credibility, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

Based on above discussion, the ALJ's discussion of Plaintiff's daily activities was not supported by substantial evidence. However, the remaining analysis was proper and the Court finds that any error was harmless. *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error).

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff Aaron Ryan, by and through his Representative, Colletta Vicki Ryan.

IT IS SO ORDERED.

Dated:   **September 16, 2009**               **/s/ Dennis L. Beck**
                                                                    UNITED STATES MAGISTRATE JUDGE